UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BAYER AKTIENGESELLSCHAFT and
DRITTE BV GmbH,

                              Plaintiffs

        v.

E. MERCK OHG, MERCK KGaA and MERCK
VIERTE ALLGEMEINE
BETEILIGUNGSGESELLSCHAFT mbH,

                              Defendants.

06 Civ. 4475 (LBS)

"ECF CASE"

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Bayer Aktiengesellschaft and Dritte BV GmbH ("Dritte") (collectively "Bayer" or "Plaintiffs"), by their undersigned attorneys, as and for their Verified Complaint against Defendants Merck KGaA, E. Merck OHG, and Merck Vierte Allgemeine Beteiligungsgesellschaft mbH (collectively "Merck" or "Defendants"), allege as follows:

### Nature Of The Action

1.      This is a claim for preliminary and permanent injunctive relief against Merck for violations of Sections 14(d) and 14(e) of the Securities Exchange Act of 1934, as amended ("Williams Act"), and codified at 15 U.S.C. §78n(d) and (e), and for tortious interference with prospective business relations.  It involves a pharmaceutical company, Merck, that sought to acquire another pharmaceutical company, Schering AG ("Schering"), whose shares are traded on the New York Stock Exchange.  Approximately 19 percent of Schering's stock is held by U.S. investors.

2.      Merck's bid to take over Schering failed when it was substantially outbid by Bayer.  Rather than compete with Bayer by paying more money to Schering's shareholders, Merck has instead attempted to acquire just enough shares to prevent Bayer's tender offer from succeeding – while also covertly conducting its own tender offer in violation of federal law.  To accomplish this, Merck has bought over *three billion dollars worth* of Schering stock in a period of only *six days*.

3.      Merck, however, chose not to inform the investing public of its plans, as required by the federal securities laws.  Merck deliberately delayed filing the required disclosures, which is itself a violation.  When it finally did so, Merck omitted required, material information concerning (among other things) its intentions and its desire to acquire more shares.

4.      As a result of Merck's violations, investors – including Bayer – were unaware that Merck was plotting to derail Bayer's tender offer and thus deprive Schering's shareholders of the opportunity to sell their shares at a significant premium.  This allowed Merck to acquire significant blocks of Schering shares at artificially low prices -- indeed, most of them below the price offered in Bayer's tender offer.  If Merck had complied with its disclosure obligations, shareholders would have known there was a threat to the opportunity to sell their shares at the premium reflected in the Bayer tender offer, and they would have reacted accordingly (either by demanding higher prices or retaining their shares so that Merck could not block the tender offer). Merck's concealment also (among other things) prevented Bayer from learning of the risk, which Bayer would have responded to by buying up shares itself.

5.      When Merck finally got around to disclosing its rapid acquisition of billions of dollars worth of shares, it had a profound impact on the market, exerting pressure on Schering shareholders to sell their shares immediately (without the opportunity to evaluate and choose whether to accept Bayer's tender offer instead) out of fear that Merck's actions would block Bayer's tender offer and thus deprive them of the opportunity to obtain a premium for their shares.  Merck's failure to make full and accurate disclosures of its plans and intentions caused further confusion and disruption.  Merck thus violated Schering shareholders' rights under the Williams Act to be afforded a fair opportunity to evaluate and choose whether to accept Bayer's tender offer.

6.      Merck's conduct violated Section 14(e) of the Securities Exchange Act because by fraudulently and deceptively concealing its rapid accumulation of Schering shares until Bayer's tender offer (which was contingent on 75% acceptance) was in serious jeopardy, Merck forced Schering shareholders to immediately sell to a purchaser other than Bayer out of fear that

Bayer's tender would fail, and they would be deprived of the market's premium on their shares. Merck also used the shareholder panic they had created to ramp up its own accumulation of Schering shares as part of its own illegal, unconventional tender offer in violation of Sections 14(d) and 14(e).  In doing so, Merck flouted the SEC's disclosure rules imposed on its tender offer and engaged in a series of material misstatements and omissions, thereby depriving Schering shareholders of a fair opportunity to evaluate and choose whether to accept Merck's or Bayer's offer.

7.     In addition, Merck blatantly violated the procedural rules required for tender offers under Sections 14(d) and 14(e) of the Williams Act, including that the offer remain open a minimum of 20 business days, that shareholders have a right of withdrawal for the duration of the offer period, that shares purchased in a partial tender offer be pro-rated among all shareholders who tender during the entire period of the tender offer, and that all shareholders receive the same price per share.

8.     Finally, by violating its federal disclosure obligations and misleading both Bayer and the market in general, Merck used "wrongful means" to interfere with (1) Bayer's prospective agreements with Schering's shareholders (including its many U.S. shareholders) who would have tendered their shares to Bayer for sale pursuant to Bayer's tender offer, and (2) Bayer's prospective acquisition of Schering, which would have resulted in significant value to Bayer.

9.     Bayer seeks preliminary and permanent injunctive relief based on Merck's violation of the federal securities laws, as well as compensatory damages to redress Bayer's injuries from Merck's tortious interference.  Bayer seeks injunctive relief restraining Merck from voting the shares it acquired during the period when it failed to comply with its disclosure

obligations, as well as an order requiring Merck to divest itself of those shares, so that Merck will not retain the fruits of its illicit activity.  Finally, due to the egregious nature of Merck's misconduct, and in view of the fact that the harm from Merck's misconduct was suffered not merely by Bayer but by the investing public at large, Bayer seeks an award of punitive damages.

### Parties

10.     Plaintiff Bayer Aktiengesellschaft is a German stock corporation with its registered seat in Leverkusen, Federal Republic of Germany, and is registered in the commercial register of the local court of Cologne under HRB 48248, and has its business address at 51368 Leverkusen, Federal Republic of Germany.  Bayer Aktiengesellschaft's stock is listed on the New York Stock Exchange.

11.     Plaintiff Dritte BV GmbH is a German limited liability company with its registered seat in Leverkusen, Federal Republic of Germany, and is registered with the commercial register of the local court of Cologne under registration number HRB 52162, and has its business address at Kaiser-Wilhelm Allee 1, 51373 Leverkusen, Federal Republic of Germany.  Dritte BV GmbH is a wholly-owned subsidiary of Bayer.

12.     Defendant Merck KGaA is a German partnership limited by shares, with its principal office at Frankfurter Strasse 250, 64293 Darmstadt, Germany.

13.     Defendant E. Merck OHG is a German general partnership, with its principal office at Frankfurter Strasse 250, 64293 Darmstadt, Germany.  E. Merck OHG is the general partner of Merck KGaA and owns approximately 73 percent of its equity.

14.     Defendant Merck Vierte Allgemeine Beteiligungsgesellschaft mbH is a German limited liability company wholly owned by Merck KGaA, with its principal office at Frankfurter Strasse 250, 64293 Darmstadt, Germany.

15.     Non-party Schering AG is a German stock corporation with its principal business office at Müllerstraße 178, 13353 Berlin, Federal Republic of Germany.

## Jurisdiction And Venue

16.     This Court has subject matter jurisdiction over this action under 15 U.S.C. § 78aa, 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

17.     This Court has personal jurisdiction over Defendants under Section 27 of the Securities Exchange Act, 15 U.S.C.S. § 78aa.  Defendants have made filings pursuant to the Securities Exchange Act and this action arises out of and relates to those filings.

18.     Moreover, Defendants do business in this district and caused effects in this district by conduct elsewhere.  Merck has two wholly owned subsidiaries located and registered in the State of New York, EMD Chemicals Inc. and Genpharm L.P.  Genpharm, L.P. is a new affiliate of the Merck Generics global group of companies and EMD Chemicals Inc., which employs 694 people at its New York location, "represents the North American extension of Merck KGaA, Darmstadt, Germany, for specialty chemicals" and achieved EUR 214.9 million in sales in 2005. Another wholly owned U.S. subsidiary, Dey, Inc., markets prescription drugs for the treatment of allergies and respiratory diseases nationwide, including the ubiquitous EpiPen autoinjector, as well as other popular diagnostic and delivery products, and achieved EUR 436.1 million in sales in 2005.

19.     Venue is proper in this court pursuant to 15 U.S.C. § 78aa and 28 U.S.C.S. § 1391 because Defendants transact business in this district and are subject to personal jurisdiction in this district, and events giving rise to the claim occurred in this district.

**Background Facts**

***Merck Announces Its Plan To Take Over Schering***

20.     Merck has been plotting for months to take over Schering.  Between January 20 and March 10, 2006, Merck accumulated 5.1 percent of Schering's issued and outstanding stock. Merck's March 10, 2006 acquisition put it over the ownership threshold of five percent of the company's issued and outstanding stock (*i.e.*, not including treasury shares) that required it to file disclosures under Section 13(d) of the Securities Exchange Act of 1934, as amended, codified at 15 U.S.C. § 78m(d).

21.     On March 12, 2006, Schering announced that it had received from Merck an unsolicited, all-cash offer for the shares of Schering for EUR 77 per share.  Schering announced that it believed this offer "significantly undervalue[d] Schering and its prospects as an independent specialized pharmaceutical company," and stated that "no negotiations are ongoing" with Merck.

22.     On March 13, 2006, Merck publicly confirmed "its decision to make a public takeover offer to Schering AG shareholders with the goal to combine the two companies and create a world-class pharmaceuticals and chemicals company with combined pro-forma annual revenues of EUR 11.2 billion."  Merck stated that the combination of Merck and Schering would "provide[] both companies with the unique opportunity to take a quantum leap and become more competitive and continue to thrive in the consolidating global pharmaceuticals industry," that Merck wanted "to build on the complementary strengths of both companies," and that Merck believed "that by combining our businesses we can create a more competitive global platform for further sustainable and profitable growth through a larger and more balanced portfolio in key therapeutic areas and through increased geographic reach."

23.    Merck also publicly announced that it expected to complete its tender offer by "Early June 2006."

24.    Merck made clear that its intention was a complete takeover of Schering.  When asked at a press conference if it sought a "complete integration" in which the Schering stock would "disappear from the market," a Merck officer replied: "Yes, we want 100%. This will take a long time but some point and time we'll have 95% and then the share will disappear from the market and will go into our safes.  Somewhere in the back."

### *Merck Files Its Schedule 13D Disclosures With The SEC*

25.    Section 13(d)(1) of the Williams Act requires "any person" who acquires "directly or indirectly the beneficial ownership" of more than five percent of a class of securities of a publicly-traded corporation to file a Schedule 13D with the Securities and Exchange Commission ("SEC").

26.    Schering's stock is traded on the New York Stock Exchange in the form of American Depositary Shares ("ADSs").  As of February 1, 2006, there were 1,760 registered holders of ADSs, who collectively held 9,401,628 ADSs.  Those ADSs represented approximately 4.3 percent of the total outstanding shares of Schering.  Schering's ordinary shares are also traded in the United States in the over-the-counter market.  Schering has estimated that as of February 2006, approximately 19 percent of its shares (including the shares represented by ADSs) were held in the United States.

27.    Accordingly, when Merck acquired more than five percent of the outstanding stock of Schering, it became obligated to file a Schedule 13D.

28.    Pursuant to Item 4 of 17 C.F.R. § 240.13d-101, reporting persons are required to state in their Schedule 13D "the purpose or purposes of the acquisition" of the stock.  Reporting

persons are also required to describe "any plans or proposals which the reporting persons may have which relate to or would otherwise result in," among other things, "(a) the acquisition by any person of additional securities of the issuer"; "(b) an extraordinary corporate transaction, such as a merger, reorganization or liquidation," "(f) any other material change in the issuer's business or corporate structure . . ."; and "(j) any action similar to any of those enumerated above."

29.     Pursuant to Item 5 of 17 C.F.R. § 240.13d-101, reporting persons are required to disclose the number and percentage of the class of securities identified in Item 1 that are beneficially owned by the reporting person.

30.     On March 20, 2006 Merck filed its initial Schedule 13D.  In its Schedule 13D, Merck stated that it intended "to commence a tender offer to purchase all of the Ordinary Shares" of Schering, "including Ordinary Shares represented by [ADSs], pursuant to Section 10 of the German Securities Acquisition and Takeover Act."

31.     Merck further stated that its tender offer would be conditioned upon receiving "at least 51%" of the Company's outstanding stock, and that the purpose of the tender offer was "to acquire control of, and at least 51% of the equity interest in," Schering.

*Bayer Ups The Ante And Merck (Purportedly) Folds*

32.     On March 23, 2006, Bayer announced that it had decided to make an offer to acquire all of the outstanding shares of Schering for EUR 86 per share – a significant increase over Merck's offer of EUR 77 per share.  Schering announced that its Executive Board would support the Bayer offer and recommend it to the shareholders.

33.     On March 24, 2006, Merck announced "that it will not increase its offer of EUR 77 per Schering share or ADS (American Depositary Receipt) announced on March 13, 2006" in

response to the Bayer offer.  Merck announced that its Executive Board had "reached the conclusion that a higher price per Schering share is not justified in the view of Merck and has therefore decided not to pursue the planned takeover of Schering."

34.     SEC rules require "prompt" amendment of a filer's Schedule 13D whenever a material change occurs in the facts set forth therein.  17 C.F.R. § 240.13d-2(a)..  Rule 13d-2(a), 17 C.F.R. §240.13d-2a.  "Prompt" in this context means as soon as reasonably practicable.

35.     On March 24, 2006, Merck filed an amendment to its previously-filed Schedule 13D, stating that consistent with its public announcement that day "it will not increase its offer of EUR 77 per Ordinary Share or ADS of the Company and has decided not to pursue the planned Tender Offer for the Company originally announced on March 13, 2006."  Merck never made the necessary filings to commence its tender offer, either in Germany or the U.S.

36.     On March 27, 2006, Dr. Michael Romer -- Merck's General Partner and the Chairman of its Management Board – sent a letter to Bayer's Chairman, Werner Wenning, congratulating him on the initial step in Bayer's effort to take over Schering.  Dr. Romer stated that he was glad to see that Bayer and Merck did not become embroiled in a lengthy and time-consuming bidding contest that would be covered by the media.  Dr. Romer further stated that the parties had practiced the sort of "fair play" that he believed would allow the parties to maintain a good relationship, and he offered Bayer his best wishes for the successful completion of the transaction.

37.     Merck therefore expressed both publicly and privately that it had no intention of continuing to pursue a takeover of Schering.  Neither Bayer nor the market at large had any reason to believe that Merck would seek to challenge Bayer's tender offer.

38.     As discussed below, however, the reality of Merck's intentions was far removed from the picture Merck had painted in its disclosures – and Merck's plans involved anything but the sort of "fair play" that Dr. Romer described.

### Bayer Launches A Tender Offer That Contemplates Over $3.8 Billion Worth Of Contracts With United States Investors, All Of Which Were To Be Entered Into In New York

39.     On April 13, 2006, Bayer commenced its tender offer by publishing an Offer Document that had been reviewed by the applicable German regulatory body, and by filing a Schedule TO with the SEC.  The initial offer period was to run until May 31, 2006.

40.     Bayer's tender offer was subject to a condition that Bayer receive at least 75 percent of the issued and outstanding shares of Schering.

41.     Under the terms of Bayer's offer, shareholders who tendered their shares would (upon completion of the tender offer) receive EUR 86 per share.  Schering had 191,000,875 outstanding shares at the time of the offer, which equated to a total offer of approximately EUR 16,426,075,250 billion (which equates to roughly $20.2 billion in U.S. dollars).  Because approximately 19 percent of the shares were held in the United States, this meant that Bayer offered to enter into approximately $3.8 billion worth of contracts with United States investors.

42.     Under the terms of Bayer's tender offer, United States investors who wished to accept the offer were required to complete a "Declaration of Acceptance" form and deliver it to the designated "U.S. Settlement Agent," namely, the Bank of New York, care of designated addresses in New York City.  Bayer's tender offer thus contemplated that approximately $3.8 billion worth of prospective contracts would be entered into in New York.

43.     On May 30, 2006, Bayer waived one of the conditions to the tender offer, resulting in an automatic extension of the acceptance period so that it would run until June 14,

2006.  Under German law, the consequence of this was that no further amendments could be made to the tender offer and the tender offer could not be further extended.

### Merck Launches A Plan To Block Bayer's Tender Offer And Ultimately Take Over Schering, But Carefully Avoids Alerting The Market To Its Activities

44.     Although Merck had stated in its amended Schedule 13D that it had withdrawn its tender offer and "decided not to pursue" a takeover of Merck because it believed a price higher than EUR 77 per share was "not justified," Merck in fact continued to covet Schering.

45.     As the deadline for Bayer's tender offer approached, Merck began a series of steps that collectively amounted to an unlawful unconventional tender offer.  On information and belief, Merck deliberately failed to promptly and accurately amend its Schedule 13D disclosures so that investors – and particularly Bayer – would be lulled into a false sense of security, not realizing that Merck was plotting at a minimum to derail Bayer's tender offer and, in fact, to acquire Schering itself.

46.     On May 30, 2006, the same day that Bayer announced the extension of its acceptance period, Merck purchased an additional 35,000 Schering shares.  That acquisition gave Merck 4.998 percent of Schering's total stock (including treasury shares) – just below the threshold for triggering certain disclosure obligations under German securities laws.  (Merck had already passed the disclosure threshold under SEC rules, which is five percent of the issued and outstanding stock – *i.e.*, without treasury shares.)

47.     Merck did not amend its Schedule 13D to disclose this acquisition of additional shares.  Nor did Merck amend its Schedule 13D to disclose the purpose of acquiring these shares, or to disclose any change in the purpose for which it held its Schering stock.  Nor did Merck amend its Schedule 13D to disclose any plans to acquire additional shares.  Nor did Merck disclose any plans that would relate to an extraordinary corporate transaction (such as a plan to

block a tender offer).  Nor did Merck disclose any plans to make any material changes in Schering's business or corporate structure (such as through a tender offer).

48.     Merck thus carefully avoided telling the market that it was still interested in buying Schering stock.  Doing so would have alerted Bayer that it was facing a possible challenge to its tender offer.  It also would have alerted shareholders that there might be another bidder for their shares.  It also would have alerted shareholders that Merck might be seeking to acquire enough shares to block Bayer's tender offer with its substantial premium, thereby depriving the Schering stockholders of the opportunity to sell their shares at a premium.

***Merck Begins An All-Out Effort To Acquire Schering Shares And Block Bayer's Tender Offer, But Deliberately Fails To Make The Prompt Disclosures Required Under Federal Law***

49.     A week later, on June 6, 2006, Merck acquired an additional 2,006,000 Schering shares – equivalent to approximately one percent of the issued and outstanding stock – for EUR 85.63 per share.  This amounted to a purchase of approximately EUR 171.8 million worth of shares, or approximately $222.4 million.  SEC rules state that an acquisition of an additional one percent of the outstanding stock is a material change that must be disclosed promptly.

50.     Merck made a regulatory filing that day in Germany announcing that it had increased its shareholdings in Schering to 6 percent of the outstanding stock.  However, despite its obligation to amend its Schedule 13D "promptly," Merck did not amend its Schedule 13D on June 6, 2006.  As a result, its existing Schedule 13D, which remained on file, was false and misleading.

51.     On June 7, 2006, Merck acquired an additional 3,000,000 shares of Schering stock for EUR 85.79 per share.  This amounted to a purchase of approximately EUR 257.4 million worth of shares, the equivalent of approximately $331.4 million.

52.     Despite its obligation to amend its Schedule 13D "promptly," Merck did not amend its Schedule 13D on June 7, 2006.   As a result, its existing Schedule 13D, which remained on file, was false and misleading.

53.     Because Merck did not promptly advise the market of its acquisitions, investors (including Bayer) were deprived of material information.  If Merck had disclosed its acquisitions on June 6, 2006, or even on June 7, 2006, investors would have been alerted to the fact that a major shareholder (who had announced a desire to take over the company just a few months earlier) was making significant acquisitions and was threatening to block Bayer's tender offer (with its significant premium).  This would have driven the trading price upward and made it more difficult for Merck to acquire the additional shares.  Moreover, if thus alerted Bayer would have begun acquiring shares itself to ensure that it would satisfy the 75 percent condition for its tender offer.

54.     Because Merck did not file a prompt amendment to its Schedule 13D, investors (including Bayer) were deprived of material information concerning Merck's intentions and plans.  If Merck had complied with its obligations under the Williams Act, it would have been forced to disclose its true purposes, plans and intentions, which, on information and belief, were (1) to continue acquiring shares, (2) to block the Bayer tender offer, and (3) to take over Schering itself.

55.     Merck's failure to promptly and accurately amend its Schedule 13D also violated Section 14(e) of the Securities and Exchange Act, which prohibits "any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation."

56.     In addition, Merck's conduct – from its announcement in March that it intended to take over Schering, through and including its surreptitious, large-scale acquisitions – amounted to a tender offer by Merck itself that was not in compliance with the requirements of Section 14 of the Securities Exchange Act.  Merck's disclosure violations deprived Schering shareholders of a full and fair opportunity to evaluate and choose whether to accept Bayer's tender offer.

57.     Merck's acquisitions of June 6 and 7, 2006 were therefore in violation of the Williams Act.

### In Furtherance Of Its Plan To Block Bayer's Tender Offer, Merck Files A False And Misleading Amendment To Its Schedule 13D

58.     On June 8, 2006, Merck acquired an additional 4,500,000 shares of Schering stock for EUR 85.765 per share.  This amounted to a purchase of approximately EUR 385.9 million worth of shares, the equivalent of approximately $494.5 million.

59.     Merck's acquisitions on June 6, 7 and 8 of 2006 combined to give Merck approximately 10.1 percent of the issued and outstanding stock of Schering.  In those three days, Merck spent nearly $1.05 billion to double its Schering holdings.

60.     Once it had obtained sufficient shares to put the Bayer tender offer in jeopardy, Merck surprised the public by at long last disclosing its covert acquisition of massive quantities of Schering shares.  On June 8, 2006, Merck finally amended its Schedule 13D to disclose its May 30 acquisition of 35,000 shares; its June 6 acquisition of 2,006,000 shares; its June 7, 2006 acquisition of 3,000,000 shares; and its June 8 acquisition of 4,500,000 shares.

61.     Merck filed its June 8, 2006 amendment after the close of the New York Stock Exchange's business day, which was also well after the close of the German stock markets.

62.     Merck's amendment to its Schedule 13D was not "prompt" as required by Section 13(d) of the Securities Exchange Act and the applicable SEC regulations.

63.     Merck knew that this disclosure would generate significant confusion in the market and would pressure Schering shareholders into selling their shares immediately out of fear that Bayer's tender offer would fail.   Indeed, the market reaction to Merck's belated announcement was significant.  From June 1, 2006 through June 7, 2006 the volume of Schering ADSs being traded on the NYSE ranged from 650,000 shares to 1.61 million shares a day.  On June 8, 2006, the date of Merck's disclosure, the trade volume leaped to 4.96 million shares, and stayed up at 3.89 million shares on June 9, 2006.

64.     Merck's belated disclosure was also false and misleading.  Merck's amended Schedule 13D stated that the "purpose" of its acquisition was only "to secure its investment position in the Company in the event that the Bayer Offer is ultimately not successful."

65.     Merck did not amend its Schedule 13D to disclose any plans to acquire additional shares.  Nor did Merck disclose any plans that would relate to an extraordinary corporate transaction (such as a plan to block a tender offer).  Nor did Merck disclose any plans to make any material changes in Schering's business or corporate structure (such as through a takeover).

66.     On information and belief, Merck's amended Schedule 13D was false and misleading in that it failed to disclose Merck's true purpose and its true plans: (1) to continue acquiring shares, (2) to block the Bayer tender offer by acquiring at least 25 percent of the issued and outstanding stock of Schering (or to come close enough that as a practical matter Bayer would not be able to acquire the 75 percent necessary under the terms of its tender offer); and (3) ultimately, to take control of Schering.

67.     Merck's untimely, false and misleading disclosures deprived Schering shareholders of a full and fair opportunity to evaluate and choose whether to accept Bayer's tender offer.

***In Furtherance Of Its Plan To Block Bayer's Tender Offer, Merck Files A Second False And
Misleading Amendment To Its Schedule 13D***

68.     As noted above, Merck did not disclose any intention to acquire additional shares

in the amendment to its Schedule 13D that Merck filed at the end of the day on June 8, 2006.

69.     The very next day, on June 9, 2006 Merck acquired an additional 16,178,456

shares of Schering stock for EUR 85.953 per share, amounting to a purchase of approximately

EUR 1.39 billion worth of stock, the equivalent of $1.77 billion.  This purchase amounted to

approximately 8.5 percent of the issued and outstanding shares.  This gave Merck a total of 18.6

percent of the issued and outstanding shares of Schering.

70.     With its June 9, 2006 acquisition, Merck had acquired over 13 percent of the

issued and outstanding shares in a four-day period.

71.     On June 9, 2006, Merck filed an amendment to its Schedule 13D announcing its

June 9, 2006 acquisition.

72.     In its June 9, 2006 amendment Merck stated that it did not intend to tender its

shares into the Bayer tender offer during the initial offer period, but reserved the right to do so

"in light of the circumstances existing from time to time."

73.     On information and belief, on or about June 9, 2006, Merck's Director of Investor

Relations, Sascha Becker, communicated with market participants and told them, among other

things, that Merck believed that Schering was a good "strategic fit" for Merck.  In response to

investors' questions about what Schering's intentions were, on information and belief, Mr.

Becker advised the market participants to "use their imagination" and "be creative," and that

Merck "could be doing anything."

74.     On information and belief, Merck's June 9, 2006 amended Schedule 13D – like

its previous amendment -- was false and misleading in that it failed to disclose Merck's true

purpose and its true plans: (1) to continue acquiring shares, (2) to block the Bayer tender offer by acquiring at least 25 percent of the issued and outstanding stock of Schering (or to come close enough that as a practical matter Bayer would not be able to acquire the 75 percent necessary under the terms of its tender offer); and (3) ultimately, to take control of Schering – the intention that Merck publicly announced in March, and which remained its intention at all relevant times.

75.   On information and belief, Merck never changed its original intent as announced in March 2006: to take over Schering.

76.   Merck's untimely, false and misleading disclosures deprived Schering shareholders of a full and fair opportunity to evaluate and choose whether to accept Bayer's tender offer.

### In Furtherance Of Its Plan To Block Bayer's Tender Offer, Merck Files A Third False And Misleading Amendment To Its Schedule 13D

77.   On June 12, 2006, Merck acquired an additional 4,049,114 shares of Schering stock for EUR 86.064 per share.  This amounted to a purchase of approximately EUR 348 million worth of shares, the equivalent of approximately $440 million.

78.   This purchase amounted to approximately 2.1 percent of the issued and outstanding shares.  This gave Merck a total of 20.7 percent of the issued and outstanding shares of Schering – perilously close to the 25 percent level needed to block Bayer's tender offer.

79.   On June 12, 2005, Merck filed another amendment to its Schedule 13D. However, although Merck has now acquired over fifteen percent of the issued and outstanding stock of Schering in the space of six days, more than quadrupling its holdings, at a cost of over $3.2 billion, Merck *still* did not amend its Schedule 13D to disclose that it intended to acquire additional shares.

80.     On information and belief, Merck's June 12, 2006 amended Schedule 13D – like its previous amendments -- was false and misleading in that it failed to disclose Merck's true purpose and its true plans: (1) to continue acquiring shares, (2) to block the Bayer tender offer by acquiring at least 25 percent of the issued and outstanding stock of Schering (or to come close enough that as a practical matter Bayer would not be able to acquire the 75 percent necessary under the terms of its tender offer); and (3) ultimately, to take control of Schering – the intention that Merck publicly announced in March, and which remained its intention at all relevant times.

81.     Merck's untimely, false and misleading disclosure deprived Schering shareholders of a full and fair opportunity to evaluate and choose whether to accept Bayer's tender offer.

### *Merck's Conduct Amounted To An Unconventional Tender Offer In Violation Of The Williams Act*

82.     Sections 14(d) and 14(e) of the Williams Act, and the rules adopted thereunder, impose certain rules for conducting a tender offer.  These include (among other things):

- Rule 14d-7 (requiring Merck to grant Schering shareholders withdrawal rights during the entire period of the tender offer);

- 14d-8 (requiring Merck to purchase shares on a pro rata rather than first-come, first-served basis);

- 14d-10 (requiring Merck to pay the same per-share price for all shares purchased in its tender offer);

- 14e-1 (requiring Merck to follow the rules set forth therein designed to prevent fraudulent, deceptive or manipulative acts or practices within the meaning of Section 14(e) of the Act);

- 14e-1(a) (requiring Merck to hold its tender offer open for at least 20 days);

- 14e-1(b) (requiring Merck to extend its offer for increases or decreases in (i) the percentage of the class of securities being sought or (ii) the consideration offered); and

- 14e-5 (prohibiting Merck from purchasing shares outside of its tender offer).

83.     Merck followed none of these rules in conducting its unconventional tender offer.

84.     Moreover, Section 14(d) of the Williams Act and the rules promulgated thereunder require any person making a tender offer to file a Schedule TO and a Schedule 14D-9 with the SEC.  Information disclosed in the SEC filings include (1) the tender offer price; (2) how long the tender offer will last; (3) how to participate in the tender offer; (3) the background and reason for the acquisition of shares; (4) the intention to acquire additional shares; (5) the source of financing for the tender offer; (6) and where and how the purchases took place.

85.     As noted above, on March 13, 2006, Merck publicly confirmed "its decision to make a public takeover offer to Schering AG shareholders."  Contrary to its declaration on March 24, 2006 that it had abandoned its takeover offer and no longer sought to acquire Schering, Merck continued to solicit Schering shareholders for their shares.  In the span of nine business days, Merck acquired over 25.5 million shares – the lion's share of which were acquired in a span of six days, at a cost of over $3.2 billion.

86.     Yet at no time following its announcement on March 24, 2006 that it would seek to acquire control of Schering did Merck file with the SEC either a Schedule TO or a Schedule 14D-9.  Merck's failure to disclose information regarding the tender offer or file with the SEC any of the schedules required to be filed under Section 14(d) of the Williams Act constituted a further violation of the Act.

### First Claim For Relief

(Violation of Section 14(e) of the Williams Act for Fraudulent and Manipulative Acts)

87.     Plaintiffs incorporate herein the allegations in paragraphs 1 – 86 above.

88.     Merck engaged in manipulative and deceptive acts aimed at deceiving and manipulating Schering shareholders regarding Bayer's tender offer.  Merck concealed its covert

campaign to acquire sufficient shares to jeopardize Bayer's tender offer, in violation of the Williams Act.

89.    Merck fraudulently and deceptively concealed its actions and motives from Schering shareholders, biding its time until it had acquired enough shares in violation of the William Act to jeopardize Bayer's tender offer to Schering's shareholders.  Merck knew that if it revealed its aggressive and on-going acquisition of Schering shares to the public when it first began its campaign, some Schering shareholders might not sell their shares to Merck to ensure the tender offer went through.  Similarly, disclosing its intentions would have meant permitting Bayer an opportunity to offer other options that Schering shareholders might find more appealing.

90.    Merck revealed its aggressive acquisition of Schering shares only when it thought the number of its shares it had acquired posed a danger to Bayer's tender offer.  In disclosing this fact when it did, Merck pressured the Schering shareholders into selling their shares in the market or to Merck rather than tendering them to Bayer because if Bayer's tender offer failed due to Merck, Schering shareholders would lose the opportunity to gain a premium.

91.    Thus Merck sought unlawfully to deprive Schering public shareholders of a fair opportunity to evaluate and choose whether to accept Bayer's tender offer, instead forcing Schering shareholders to make an immediate investment decision regarding Bayer's offer in violation of the securities laws and contrary to the interests of Schering's shareholders and Bayer – all the while without the full information that the shareholders were entitled to under the Williams Act, due to Merck's inaccurate and incomplete disclosures.

92.     Merck's fraudulent manipulation of Schering's shareholders to prevent them from having the opportunity to evaluate Bayer's tender offer or tender their shares to Bayer was wrongful, dishonest, unfair or improper as set forth above.

93.     But for Merck's failure to comply with the Williams Act disclosure requirements, material misstatements and omissions, and other fraudulent acts, Schering shareholders would have had a full and fair opportunity to evaluate Bayer's tender offer and choose whether to accept the tender offer.

94.     Merck's violation of Section 14(e) of the Williams Act has caused, and continues to cause, Schering shareholders irreparable harm that cannot be adequately compensated in monetary damages, and for which preliminary and permanent injunctive relief is appropriate.

## Second Claim For Relief

(Violation of Section 14(d) of the Williams Act)

95.     Plaintiffs incorporate herein the allegations in paragraphs 1 - 94 above.

96.     Merck's active and broad solicitation and rapid acquisition of Schering shares constituted an illegal, unconventional tender offer in violation of Sections 14(d) and 14(e) of the Wiliams Act and the rules adopted thereunder.

97.     By virtue of its unconventional tender offer, Merck was subject to the disclosure and filing requirements of Section 14(d) of the Williams Act and the rules adopted thereunder.

98.     Merck's failure to file a Schedule TO violated its obligations under Section 14(d) of the Williams Act and the rules adopted thereunder.

99.     Merck's failure to disclose: (1) the tender offer's price; (2) how long the tender offer would last; (3) how to participate in the tender offer; (3) the background and reason for the acquisition of shares; (4) the intention to acquire additional shares; (5) the source of financing for

the tender offer; (6) and where and how the purchases took place were further violations of its disclosure obligations under Section 14(d) of the Williams Act and the rules adopted thereunder.

100.   Merck's decision not to make these disclosures was wrongful, dishonest, unfair or improper as set forth above.

101.   The information Merck failed to disclose was material information to Schering's shareholders in their decision to sell, tender, or keep their shares.

102.   Merck's violation of Section 14(d) of the Williams Act and the rules adopted thereunder has caused, and continues to cause, Schering shareholders irreparable harm that cannot be adequately compensated in monetary damages, and for which preliminary and permanent injunctive relief is appropriate.

### Third Claim For Relief

(Violation of Sections 14(d) and 14(e) of the Williams Act)

103.   Plaintiffs incorporate herein the allegations in paragraphs 1 - 102 above.

104.   Merck's active and broad solicitation and rapid acquisition of Schering shares constituted an illegal, unconventional tender offer in violation of Sections 14(d) and 14(e) of the Wiliams Act and the rules adopted thereunder.

105.   Merck's illegal, unconventional tender offer violated at a minimum the following SEC Rules:

- Rule 14d-7 (requiring Merck to grant Schering shareholders withdrawal rights during the entire period of the tender offer);

- 14d-8 (requiring Merck to purchase shares on a pro rata rather than first-come, first-served basis);

- 14d-10 (requiring Merck to pay the same per-share price for all shares purchased in its tender offer);

- 14e-1 (requiring Merck to follow the rules set forth therein designed to prevent fraudulent, deceptive or manipulative acts or practices within the meaning of Section 14(e) of the Act);

- 14e-1(a) (requiring Merck to hold its tender offer open for at least 20 days);

- 14e-1(b) (requiring Merck to extend its offer for increases or decreases in (i) the percentage of the class of securities being sought or (ii) the consideration offered); and

- 14e-5 (prohibiting Merck from purchasing shares outside of its tender offer).

106.    Merck's violations of Section 14(d) and 14(e) of the Williams Act, and the rules adopted thereunder, has caused, and continues to cause, Schering shareholders irreparable harm that cannot be adequately compensated in monetary damages, and for which preliminary and permanent injunctive relief is appropriate.

**Fourth Claim For Relief**

(Violation of Section 14(e) of the Williams Act for Fraudulent Concealment)

107.    Plaintiffs incorporate herein the allegations in paragraphs 1 - 106 above.

108.    Merck deliberately concealed and mischaracterized its motives and actions for pursuing an aggressive campaign to acquire Schering shares to mislead Schering shareholders and Bayer regarding its covert  tender offer launched as part of its continuing bid to gain control of Schering.

109.    Merck's purposeful concealment of its covert tender offer in its bid to control Schering deceived and defrauded the Schering shareholders by manipulating the information that was made available to them.

110.    Merck concealed information regarding:  (1) Merck's tender offer price; (2) how long Merck's tender offer will last; (3) how to participate in Merck's tender offer; (3) the background and reason for the acquisition of shares; (4) Merck's intention to acquire additional

shares; (5) the source of financing for the tender offer; and (6) where and how Merck's purchases took place.

111.    Merck's fraudulent concealment and deception of Schering's shareholders prevented the shareholders from being able to evaluate Merck's tender offer and was wrongful, dishonest, unfair or improper as set forth above.

112.    But for Merck's fraudulent deception, omission, and concealment, Schering shareholders would have had the opportunity to evaluate Merck's tender offer and choose whether to accept the tender offer.

113.    Merck's violation of Section 14(e) of the Williams Act has caused, and continues to cause, Schering shareholders irreparable harm that cannot be adequately compensated in monetary damages, and for which preliminary and permanent injunctive relief is appropriate.

**Fifth Claim For Relief**

(Tortious Interference With Prospective Business Relations)

114.    Plaintiffs incorporate herein the allegations in paragraphs 1 - 113 above.

115.    By virtue of its tender offer, which Schering had recommended that its shareholders accept, Bayer had a prospective business relationship with the Schering shareholders who wished to tender their shares to Bayer pursuant to the tender offer.  Bayer's tender offer constituted an offer to enter into a contract in New York with the Schering shareholders, approximately 19 percent of whom were located in the United States.

116.    Bayer also had a prospective business relationship with Schering in that once Bayer acquired Schering, Bayer would have realized significant value due to business synergies and opportunities to increase profitability.

117.     Merck intentionally interfered with Bayer's prospective business relationship with the Schering shareholders who otherwise would have tendered their shares to Bayer pursuant to the tender offer.  As discussed above, Merck failed to amend its Schedule 13D in a timely and accurate manner, thus allowing inaccurate and misleading information to continue to be disseminated to the market.  When Merck finally did amend its Schedule 13D, it omitted material information concerning its plans and intentions, thus further misleading the market.

118.     Through this scheme, Merck was able to, among other things: (1) acquire significant Schering holdings at artificially low prices, thereby putting itself in a better position to block Bayer's tender offer, and (2) conceal from both the market in general and Bayer in particular the risk that Bayer's tender offer would be blocked, thereby preventing both the shareholders and Bayer from taking steps to ensure that the tender offer would succeed (*e.g.*, by competing with Merck to acquire Schering stock).

119.     Because of Merck's interference, Bayer's tender offer now might fail where otherwise it would surely have succeeded.  Thus, Merck also intentionally interfered with Bayer's prospective business advantages resulting from the Schering acquisition.

120.     Merck accomplished this interference through wrongful, dishonest, unfair or improper means.  As discussed above, Merck repeatedly violated its disclosure obligations and simultaneously conducted an illegal, unconventional tender offer through market purchases, as part of a calculated scheme to interfere with, and ultimately thwart, Bayer's tender offer (to which Schering had agreed).

121.     But for Merck's interfering conduct, Schering's shareholders would have tendered their shares to Bayer in sufficient amounts for Bayer's tender offer to close, and Bayer would have acquired Schering.  Bayer's offer was at a significant premium over Merck's prior offer,

which was already at a premium above the trading price before Merck's announcement.  No subsequent bidder had offered any higher price during the several months after Bayer announced its tender offer.  Rational investors would have readily accepted Bayer's tender offer absent Merck's interference.

122.    Bayer has suffered damages as a result of Merck's interference in an amount to be proven at trial.  Because of Merck's conduct, Bayer has (among other things) incurred additional costs and expenses in attempting to close its tender offer.  If the tender offer does not close, Bayer will also lose the significant value it reasonably expects to achieve through combining its business operations with Schering's.

123.    Merck's interference has also caused Bayer irreparable harm that cannot be adequately compensated in monetary damages, and for which preliminary and permanent injunctive relief is appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against the Defendants as follows:

1.    For an award of compensatory damages in an amount to be proven at trial;

2.    For preliminary and permanent injunctive relief restraining each of the Defendants from voting any shares of Schering acquired during the period that such Defendant was in violation of its disclosure obligations, or from being represented at any shareholders meeting of Schering with respect to such shares;

3.    For permanent injunctive relief against each of the Defendants ordering it to divest itself of any shares of Schering acquired during the period that such Defendant was in violation of its disclosure obligations;

4.    For permanent injunctive relief against each of the Defendants restraining it from committing any further violations of its disclosure obligations;

5.      For an award of punitive damages;

6.      For an award to Plaintiffs of the costs of this action, including attorneys' fees; and

7.      For such other and further relief as the Court may find just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rules of Civil Procedure 38, Plaintiffs respectfully demand a trial by jury of any and all issues triable of right by a jury in the above-captioned action.

Dated: June 13, 2006

New York, New York

LATHAM & WATKINS LLP

By: __/s/  Blair G. Connelly_____
     James E. Brandt (JB-3400)
     Blair G. Connelly (BC-0237)

885 Third Avenue
New York, New York 10022-4802
(212) 906-1200